08 C 1007

Atty. No. 41106

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

BALLARD NURSING CENTER, INC.,           )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )   08CH02229
                                        )
MID AMERICAN GROUP, INC.,               )
and JOHN DOES 1-10,                     )
                                        )
            Defendants.                 )

Exhibit 1

**JUDGE ZAGEL**
**MAGISTRATE JUDGE MASON**

<u>COMPLAINT – CLASS ACTION</u>

<u>MATTERS COMMON TO MULTIPLE COUNTS</u>

<u>INTRODUCTION</u>

1.      Plaintiff Ballard Nursing Center, Inc. ("Ballard") brings this action to secure redress for the actions of defendant Mid American Group, Inc. in sending or causing the sending of unsolicited advertisements to telephone facsimile machines in violation of the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA"), the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"), and the common law.

2.      The TCPA expressly prohibits unsolicited fax advertising. Unsolicited fax advertising damages the recipients. The recipient is deprived of its paper and ink or toner and the use of its fax machine. The recipient also wastes valuable time it would have spent on something else. Unsolicited faxes prevent fax machines from receiving and sending authorized faxes, cause wear and tear on fax machines, and require labor to attempt to identify the source and purpose of the unsolicited faxes.

1

## PARTIES

3.     Plaintiff Ballard is a corporation with offices at 9300 Ballard Road, Des Plaines, Illinois, 60016, where it maintains telephone facsimile equipment.

4.     Defendant Mid American Group, Inc. is a corporation that has offices at 760 Pasquinelli Drive, Suite 358, Westmont, Illinois, 60559.

5.     Defendants John Does 1-10 are other natural or artificial persons that were involved in the sending of the facsimile advertisements described below.  Plaintiff does not know who they are.

## JURISDICTION AND VENUE

6.     Personal jurisdiction exists under 735 ILCS 5/2-209, in that defendants:

      a.     Have committed tortuous acts in Illinois by causing the transmission of unlawful communications into the state.

      b.     Have transacted business in Illinois.

## FACTS

7.     On November 14, 2005, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit A on its facsimile machine.

8.     On January 13, 2006, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit B on its facsimile machine.

9.     On September 14, 2006, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit C on its facsimile machine.

10.     On September 21, 2006, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit D on its facsimile machine.

2

11.     On February 21, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit E on its facsimile machine.

12.     On March 27, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit F on its facsimile machine.

13.     On April 12, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit G on its facsimile machine.

14.     On April 23, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit H on its facsimile machine.

15.     On May 15, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit I on its facsimile machine.

16.     On June 14, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit J on its facsimile machine.

17.     On August 16, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit K on its facsimile machine.

18.     On September 4, 2007, plaintiff Ballard received the unsolicited fax advertisement attached as Exhibit L on its facsimile machine.

19.     Discovery may reveal the transmission of additional faxes as well.

20.     Defendant Mid American Group, Inc. is responsible for sending or causing the sending of the faxes.

21.     Defendant Mid American Group, Inc. as the entity whose products or services were advertised in the faxes, derived economic benefit from the sending of the faxes.

22.     Each fax refers to a website registered to defendant Mid American Group,

3

Inc.

23.    Plaintiff had no prior relationship with defendant and had not authorized the sending of fax advertisements to plaintiff.

24.    The faxes have a "remove" number at the bottom that is associated with the mass broadcasting of advertising faxes.

25.    On information and belief, the faxes attached hereto were sent as part of a mass broadcasting of faxes.

26.    On information and belief, defendants have transmitted similar unsolicited fax advertisements to at least 40 other persons in Illinois.

27.    There is no reasonable means for plaintiff or other recipients of defendants' unsolicited advertising faxes to avoid receiving illegal faxes. Fax machines must be left on and ready to receive the urgent communications authorized by their owners.

28.    Furthermore, the "opt out notice" required by the TCPA even when faxes are sent with consent or pursuant to an established business relationship was not provided in the faxes at issue.

## COUNT I – TCPA

29.    Plaintiff incorporates ¶¶ 1-28.

30.    The TCPA makes unlawful the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine ..." 47 U.S.C. §227(b)(1)(C).

31.    The TCPA,  47 U.S.C. §227(b)(3), provides:

**Private right of action.**

4

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State–

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the Court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the subparagraph (B) of this paragraph.

32.    Plaintiff and each class member suffered damages as a result of receipt of the unsolicited faxes, in the form of paper and ink or toner consumed as a result. Furthermore, plaintiff's statutory right of privacy was invaded.

33.    Plaintiff and each class member is entitled to statutory damages.

34.    Defendants violated the TCPA even if their actions were only negligent.

35.    Defendants should be enjoined from committing similar violations in the future.

## CLASS ALLEGATIONS

36.    Plaintiff brings this claim on behalf of a class, consisting of (a) all persons with Illinois fax numbers (b) who, on or after a date four years prior to the filing of this action (28 U.S.C. §1658), or such shorter period during which faxes were sent by or on behalf of defendant Mid American Group, Inc., and on or before a date 20 days following the filing of this action, (c) were sent faxes by or on behalf of defendant Mid American Group, Inc. promoting its

5

goods or services for sale (d) and with respect to whom defendant cannot provide evidence of express consent or an established business relationship prior to the faxing, together with an "opt out" notice that complies with federal law.

       37.    The class is so numerous that joinder of all members is impractical. Plaintiff alleges on information and belief that there are more than 40 members of the class.

       38.    There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. The predominant common questions include:

       a.    Whether defendants engaged in a pattern of sending unsolicited fax advertisements;

       b.    The manner in which defendants compiled or obtained their list of fax numbers;

       c.    Whether defendants thereby violated the TCPA;

       d.    Whether defendants thereby engaged in unfair acts and practices, in violation of the ICFA.

       e.    Whether defendants thereby converted the property of plaintiff.

       39.    Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling class actions and claims involving unlawful business practices. Neither plaintiff nor plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

       40.    A class action is an appropriate method for the fair and efficient adjudication of this controversy. The interest of class members in individually controlling the

prosecution of separate claims against defendants is small because it is not economically feasible to bring individual actions.

41.    Several courts have certified class actions under the TCPA. Travel 100 Group, Inc. v. Empire Cooler Service, Inc., 03 CH 14510 (Cook Co. Cir. Ct., Oct. 19, 2004); Rawson v. C.P. Partners LLC, 03 CH 14510 (Cook Co. Cir. Ct., Sept. 30, 2005); ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc., 50 P.3d 844 (Ariz. App. 2002); Core Funding Group, LLC v. Young, 792 N.E.2d 547 (Ind.App. 2003); Nicholson v. Hooters of Augusta, Inc., 245 Ga.App. 363, 537 S.E.2d 468 (2000) (private class actions); see State of Texas v. American Blast Fax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001) (state enforcement action).

42.    Management of this class action is likely to present significantly fewer difficulties that those presented in many class actions, e.g. for securities fraud.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

a.    Actual damages;

b.    Statutory damages;

c.    An injunction against the further transmission of unsolicited fax advertising;

d.    Costs of suit;

e.    Such other or further relief as the Court deems just and proper.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

43.    Plaintiff incorporates ¶¶ 1-28.

44.    Defendants engaged in unfair acts and practices, in violation of ICFA § 2, 815 ILCS 505/2, by sending unsolicited fax advertising to plaintiff and others.

45.    Unsolicited fax advertising is contrary to the TCPA and also Illinois law. 720 ILCS 5/26-3(b) makes it a petty offense to transmit unsolicited fax advertisements to Illinois residents.

46.    Defendants engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to recipients of their advertising.

47.    Plaintiff and each class member suffered damages as a result of receipt of the unsolicited faxes, in the form of paper and ink or toner consumed as a result.

48.    Defendants engaged in such conduct in the course of trade and commerce.

49.    Defendants' conduct caused recipients of their advertising to bear the cost thereof. This gave defendants an unfair competitive advantage over businesses that advertise lawfully, such as by direct mail. For example, an advertising campaign targeting one million recipients would cost $500,000 if sent by U.S. mail but only $20,000 if done by fax broadcasting. The reason is that instead of spending $480,000 on printing and mailing his ad, the fax broadcaster misappropriates the recipients' paper and ink. "Receiving a junk fax is like getting junk mail with the postage due". Remarks of Cong. Edward Markey, 135 Cong Rec E 2549, Tuesday, July 18, 1989, 101st Cong. 1st Sess.

50.    Defendants' shifting of advertising costs to plaintiff and the class members in this manner makes such practice unfair. In addition, defendants' conduct was contrary to public policy, as established by the TCPA and Illinois statutory and common law.

51.    Defendants should be enjoined from committing similar violations in the

8

future.

## CLASS ALLEGATIONS

52.    Plaintiff brings this claim on behalf of a class, consisting of (a) all persons with Illinois fax numbers (b) who, on or after a date three years prior to the filing of this action, or such shorter period during which faxes were sent by or on behalf of defendant Mid American Group, Inc., and on or before a date 20 days following the filing of this action, (c) were sent faxes by or on behalf of defendant Mid American Group, Inc. promoting its goods or services for sale (d) and with respect to whom defendant cannot provide evidence of express consent or an established business relationship prior to the faxing, together with an "opt out" notice that complies with federal law.

53.    The class is so numerous that joinder of all members is impractical. Plaintiff alleges on information and belief that there are more than 40 members of the class.

54.    There are questions of law and fact common to the class that predominate over any questions affecting only individual class members.  The predominant common questions include:

a.    Whether defendants engaged in a pattern of sending unsolicited fax advertisements;

b.    Whether defendants thereby violated the TCPA;

c.    Whether defendants thereby engaged in unfair acts and practices, in violation of the ICFA.

d.    Whether defendants thereby converted the property of plaintiff.

55.    Plaintiff will fairly and adequately protect the interests of the class.

Plaintiff has retained counsel experienced in handling class actions and claims involving unlawful business practices. Neither plaintiff nor plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

56.     A class action is an appropriate method for the fair and efficient adjudication of this controversy. The interest of class members in individually controlling the prosecution of separate claims against defendants is small because it is not economically feasible to bring individual actions.

57.     Management of this class action is likely to present significantly fewer difficulties that those presented in many class actions, e.g. for securities fraud.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

a.     Appropriate damages;

b.     An injunction against the further transmission of unsolicited fax advertising;

c.     Attorney's fees, litigation expenses and costs of suit;

d.     Such other or further relief as the Court deems just and proper.

## COUNT III – CONVERSION

58.     Plaintiff incorporates ¶¶ 1-28.

59.     By sending plaintiff and the class members unsolicited faxes, defendants converted to their own use ink or toner and paper belonging to plaintiff and the class members.

60.     Immediately prior to the sending of the unsolicited faxes, plaintiff and the class members owned and had an unqualified and immediate right to the possession of the paper

10

and ink or toner used to print the faxes.

61.    By sending the unsolicited faxes, defendants appropriated to their own use the paper and ink or toner used to print the faxes and used them in such manner as to make them unusable.  Such appropriation was wrongful and without authorization.

62.    Defendants knew or should have known that such appropriation of the paper and ink or toner was wrongful and without authorization.

63.    Plaintiff and the class members were deprived of the paper and ink or toner, which could no longer be used for any other purpose.   Plaintiff and each class member thereby suffered damages as a result of receipt of the unsolicited faxes.

64.    Defendants should be enjoined from committing similar violations in the future.

## CLASS ALLEGATIONS

65.    Plaintiff brings this claim on behalf of a class, consisting of (a) all persons with Illinois fax numbers (b) who, on or after a date five years prior to the filing of this action, or such shorter period during which faxes were sent by or on behalf of defendant Mid American Group, Inc, and on or before a date 20 days following the filing of this action, (c) were sent faxes by or on behalf of defendant Mid American Group, Inc. promoting its goods or services for sale (d) and with respect to whom defendant cannot provide evidence of express consent or an established business relationship prior to the faxing, together with an "opt out" notice that complies with federal law.

66.    The class is so numerous that joinder of all members is impractical. Plaintiff alleges on information and belief that there are more than 40 members of the class.

67.     There are questions of law and fact common to the class that predominate over any questions affecting only individual class members.  The predominant common questions include:

          a.     Whether defendants engaged in a pattern of sending unsolicited fax advertisements;

          b.     Whether defendants thereby violated the TCPA;

          c.     Whether defendants thereby committed the tort of conversion;

          d.     Whether defendants thereby engaged in unfair acts and practices, in violation of the ICFA.

          e.     Whether defendants thereby converted the property of plaintiff.

68.     Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling class actions and claims involving unlawful business practices.  Neither plaintiff nor plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

69.     A class action is an appropriate method for the fair and efficient adjudication of this controversy.  The interest of class members in individually controlling the prosecution of separate claims against defendants is small because it is not economically feasible to bring individual actions.

70.     Management of this class action is likely to present significantly fewer difficulties that those presented in many class actions, e.g. for securities fraud.

WHEREFORE, plaintiff requests that the Court enter  judgment in favor of plaintiff and the class and against defendants for:

12

a.    Appropriate damages;

b.    An injunction against the further transmission of unsolicited fax
advertising;

c.    Costs of suit;

d.    Such other or further relief as the Court deems just and proper.


_____
Daniel A. Edelman


Daniel A. Edelman
Michelle R. Teggelaar
Julie Clark
Heather A. Kolbus
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
Atty. No. 41106

13

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\16247\Pleading\Complaint_Pleading-0001.wpd

# EXHIBIT A



# MID AMERICAN GROUP

## *"The Leading Edge"* □

November, 2005

*The Advisor Advantage*

**Dear Clients and Friends,**

Keeping track of all of the details of all of the contracts that we enter into is impossible – and, it's getting harder all of the time. There are expiration dates on credit cards, memberships, licenses – the list goes on.

But, when it comes to health coverage the details in contracts are of great importance. No one wants to find out that their child has lost coverage after they've received a large hospital bill. If this happens, it's a sure thing that the employer will get an earful.

Open enrollment time is the perfect opportunity to remind employees of a plan's rules. This is also true if an employer offers a Flexible Spending Account because the employee may want to have a lower payroll reduction amount if a dependent will only be on the plan for a part of the year.

*Sincerely yours,*
*Jim Lill, President*

# Dependent Child Limits

When employer-provided health plans provide coverage for dependent children – as many do – employers and employees need to be aware of when children lose coverage under the plan. In many cases, a dependent may lose coverage and there may not be any notice that this has occurred. The information may then come to light at the worst time – when a claim for coverage is denied.

Many plans cover a dependent child until the age of 19 or, if they're a full-time student to age 25. But, every plan is governed by the contract between the employer and the insurance carrier or by the Plan Document, if the plan is self-funded. Therefore, the limiting age or rules for dependents should be revisited frequently and communicated to employees on a regular basis.

Many employers are gearing up for open enrollment season. This is an excellent opportunity to remind employees of the rules regarding dependents and the options that are available to them for dependent coverage.

When plans provide coverage based on a student's status, employees may be required to provide proof that the student is enrolled full-time. If the status of the student changes at any time, it is important to inform the carrier or plan administrator.

There are a number of options for dependents leaving the parent's plan. A first option would be coverage available through the school the dependent may be attending. Another option may be an individual policy for the dependent. But, if the child has a pre-existing condition, continuation coverage available through either state or federal laws may be the best option to pursue.

Another option is a temporary policy. This is best when the loss of coverage is likely to be short term in nature.

## *Ask us about free COBRA and FSA administration!*

Mid American Group, Inc. *The Leading Edge*© 414 Plaza Drive, Suite 303, Westmont, IL 60559  Phone: **(630) 789-9508**
Fax: (630) 789-9516   Email: JimLill@midamgroup.com   The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue the receipt of this monthly fax.)**

# EXHIBIT B



# MID AMERICAN GROUP
### *"The Leading Edge"*

January, 2006

**Dear Clients and Friends,**

Filling up the gas tank has gotten to be a favorite "water cooler" topic. There are internet sites that feature the cheapest prices for gas.

The IRS took the unusual step of increasing the standard mileage reimbursement rate in September, 2005. The rate was increased from 40.5 cents to 48.5 cents to reflect the dramatic rise in gas prices.

The new rate effective January 1, 2006 is 44.5 cents per mile for business miles driven.

Rising gas prices have renewed employer interest in transportation benefit plans. An average worker earning approximately $40,000 spends about 3.3% of their pay on gas at today's prices. A transportation plan can blunt the effect of these prices and save the employer payroll tax dollars, too.

*Sincerely yours,*
*Jim Lill, President*

# Transportation Benefits

The wallet pain that occurs at the gas pump has caused many employers and employees to reconsider commuting issues. Some employers are considering adding transportation benefits to help employees with costs. Approximately 14% of employers offer a qualified transportation plan or subsidy.

Transportation benefits provide employees with pre-tax work related parking and mass transportation benefits. These are provided through payroll reduction or employer subsidy. A payroll reduction plan reduces payroll and other taxes for both employers and employees in the same way as a Section 125 flexible spending account.

Qualified transportation benefits can be provided by the employer or through a reimbursement arrangement. Transit passes are a typical component of a transportation benefit. Many of the transit agencies can work with employers on instituting these programs.

The benefit limits are set by the Internal Revenue Service and are contained in Publication 15-B, Employer's Tax Guide to Fringe Benefits. The limits for 2006 are:

- $105 per month for combined commuter highway vehicle transportation and transit passes

- $205 per month for qualified parking.

Employers must allow all eligible employees to participate in a transportation benefit, if offered. Employees are also allowed to use any unused balances in their accounts for 90 days after termination.

De Minimis transportation benefits are not subject to the specified dollar limits. However, these benefits are excludable from employee income if it has little value. This generally applies to occasional transportation fare due to overtime work.

## Ask us about free COBRA and FSA administration!

Mid American Group, Inc. *The Leading Edge*© 414 Plaza Drive, Suite 303, Westmont, IL 60559 Phone: **(630) 789-9508** Fax: (630) 789-9516 Email: JimLill@midamgroup.com The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Milroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue the receipt of this monthly fax.)**

# EXHIBIT C

# MID AMERICAN GROUP, INC.

Requests your presence at our complimentary

### Fall Luncheon & Seminar

Friday, October 27, 2006
11:45 – 4:00 P.M.

The Hyatt Lodge
McDonalds Campus
2815 Jorie Blvd
Oak Brook, IL 60523
(630)990-5800

## AGENDA

### The Cost of Medical Benefits in 2007 and Beyond:
How to budget for them

~

### The 2007 Pension Reform Act:
What are the Implications for your Business?

~

### Reducing the Cost of Health Care:
Utilizing Pre-emptive Wellness Programs

*To make a reservation, please call:*
*630-366-7425, or email:*
*kellyfacchini@midamgroup.com*
*by Friday, October 20*

# EXHIBIT D



# MID AMERICAN GROUP
*"The Leading Edge"* ©

September, 2006

**Dear Clients and Friends,**

The Pregnancy Discrimination Act is 28 years old. As such, many employers give it little thought. And, that's probably the reason that there are more than 4,000 cases filed with the EEOC every year.

Most employers accept and value the role of women in the workforce. But, employers may try to do too much for women with the end result of discriminating, as the 1991 court case about barring women from jobs that exposed them to lead found.

The PDA does not give women with performance problems a free pass during their pregnancy, however. But, employers need to be extra vigilant in documenting any problems. When concerns arise, it may be worthwhile seeking legal advice.

*Sincerely yours,*
*Jim Lill, President*

# Pregnancy Discrimination Act

The Pregnancy Discrimination Act of 1978 (PDA) prohibits discrimination on the basis of pregnancy. The US Equal Employment Opportunity Commission (EEOC) is the federal agency charged with enforcing the Act. The PDA applies to all employers regardless of employer size.

During fiscal year 2005, the EEOC received 4,449 complaints of pregnancy discrimination. While the number of complaints over the past years has been dropping, employers need to continue their vigilance in avoiding this type of discrimination.

The law prohibits discrimination on the basis of pregnancy, childbirth or related medical conditions. Employers may not design medical plans, disability plans, sick leave plans or other employment related benefits and policies to exclude pregnant employees.

Pregnancy discrimination is also covered by other laws. These include the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA). State laws may also cover aspects of the PDA.

The PDA does not mandate particular benefits such as time off, or continuation of salary during a pregnancy. The law does require that pregnancy be treated like any other temporary disability. In addition, if spouses are provided coverage under a medical plan, the pregnant wives of male employees may not be excluded from medical coverage.

A highly publicized case in years past also illustrated that employers can't be overprotective of women who are or who may become pregnant. The employer had barred women from certain jobs for fear that a woman may have a problem with pregnancy at some time due to exposure to workplace hazards. The Courts frown on such paternalistic practices. If there is a concern, employers should seek scientific, medical and legal advice before excluding women from a job.

Employers should also have a grievance process in place for employees. An informal process can bring issues to the forefront before an employee feels the need to take formal action through the EEOC.

Some experts suggest that employers look at every one of their existing policies – both formal and informal – as if they were a pregnant woman. Any policy that seems to restrict or otherwise harm the woman should be reviewed in more detail. For example, a bonus policy based on a minimum number of hours worked in a year may discriminate against women who took time off for pregnancies. This same policy could also violate the ADA for any employee who was disabled during the year.

## Ask us about free COBRA and FSA administration!

**Mid American Group, Inc.** *The Leading Edge*© 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559 Phone: **(630) 789-9508** Fax: (630) 789-9516 Email: JimLill@midamgroup.com The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue this monthly fax.)**

# EXHIBIT E

Document 1-2    Filed 02/19/2008    Page 24 of 38

 # MID AMERICAN GROUP

*"The Leading Edge"*©

**February, 2007**

**Dear Clients and Friends,**

News of lost or stolen data has become a common occurrence. Some of the largest and most sophisticated firms have had information stolen or lost. Companies that have had data breaches spend an average of 1600 work hours per incident repairing the damage.

Businesses also lose when an employee has his/her identity stolen. An employee can take as much as 600 hours restoring his/her identity. And, since most of the firms someone need to reach are only open during business hours, this can mean that the 600 hours is lost work time.

The Federal Trade Commission is a great source of information at consumer.gov/idtheft. This site includes model letters to notify individuals regarding lost or stolen data and steps a business should take.

*Sincerely yours,*
*Jim Lill, President*

# Identity Theft – A Business Issue

Identity theft is a serious crime that has been around forever. However, the growing number and complexity of data bases and the use of the Internet have turned identity theft into an epidemic.

The average personal loss due to identity theft ranges from $40,000 - $92,000. And, employers may find themselves in the middle of the dilemma since employers have access to the personal data that ID thieves want. This data includes social security numbers, bank account numbers, birthdates and other personal information.

Even businesses can be victims of identity theft. Thieves, sometimes posing as outside vendors or janitorial services, have stolen blank business checks and letterhead stationery. They can make the checks out as "payroll" checks to get access to cash. Letterhead can be used to appear to be the company and order goods that can be shipped to a "new location" or other ruse.

There are both federal and state laws governing businesses and the use of data. Among these is the Fair and Accurate Credit Transactions Act (FACTA). This federal law applies to every

business and individual maintaining or possessing consumer information for a business purpose. If employee or customer information is lost businesses may face fines of up to $2500 per occurrence. Class action lawsuits may also be brought.

HIPAA is another federal law addressing health information. And, the Gramm, Leach Bliley Safeguard Rule applies to organizations that maintain financial information on customers or clients. Violations of these Acts can result in both civil and criminal penalties including jail time for executives.

Businesses should, as a first step, review whether any business insurance policies cover identity theft. Insurers can also be a good source for preventive measures that should be considered.

An information security policy for electronic and hard copy records should be developed and communicated to all personnel. Consideration should also be given to computer security, storage of blank checks and other financial documents and disposal of old records.

## *Ask us about free COBRA, FSA and FMLA administration!*

Mid American Group, Inc. *The Leading Edge*© 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559 Phone: **(630) 789-9508** Fax: (630) 789-9516    Email: JimLill@midamgroup.com    The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue the receipt of this monthly fax.)**

# EXHIBIT F



# MID AMERICAN GROUP

*"The Leading Edge"* ⁿ

March, 2007

**Dear Clients and Friends,**

Employers are warming to the idea of wellness programs as a means to hold down health care costs and increase employee productivity. And, wellness programs can be immensely popular with employees.

These HIPAA rules, while providing needed guidance, may not be sufficient. however.

State laws, for example, may also govern wellness programs.

Employers should take into account the dollars available for a program, the needs of employees and their families and the desired outcomes for the wellness plan.

*Sincerely yours,*
*Jim Lill, President*

# HIPAA Wellness Rules

HIPAA's final regulations do not change the 2001 interim rules or the proposed rules on wellness programs. They do clarify some ambiguities and provide a description of wellness programs that are not required to satisfy additional standards to be in compliance with nondiscrimination provisions.

The final rules generally prohibit group health insurance issuers from discriminating against individuals based on any health factor. The following examples may be implemented without having to satisfy additional HIPAA provisions:

- Reimbursement of some or all of the cost for membership in a fitness center

- A diagnostic testing program that provides a reward for participation. irrespective of the test's outcome

- A preventive care plan that waives copayments or deductibles under the group health plan

- Reimbursement for smoking cessation

programs, irrespective of whether the effort is successful

- Rewards for employees who attend health education seminars

Programs that provide for rewards based on an individual satisfying a standard related to a health factor must meet additional requirements.

The total reward that an individual can earn may not exceed 20 percent of the cost of coverage. The program must be "reasonably-designed" with a reasonable chance of improving the health of a participant. It must not be overly burdensome so as to be a subterfuge for discriminating based on a health factor. A wellness program that provides a reward requiring satisfaction of a standard related to a health factor must provide a "reasonable alternative standard" for obtaining the reward. And, all plan materials describing the terms of the program must disclose the availability of a reasonable alternative standard.

## *Ask us about free COBRA, FSA and FMLA administration!*

Mid American Group, Inc. *The Leading Edge*© 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559  Phone: **(630) 789-9508**  Fax: (630) 789-9516   Email: JimLill@midamgroup.com   The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL
(Please call us if you would like to discontinue the receipt of this monthly fax.)

# EXHIBIT G

To: Rob   Case 1:08-cv-01007   Document 72995   Filed 02/19/2008   Page 28 of 38   04 /12/93   09:05 AM   0
1

 **MID AMERICAN GROUP, INC.**

# Spring 2007 – Employee Benefits Luncheon & Seminar

Wednesday June 6th, 2007
11:30 am – Registration
12:00 Lunch, Seminar 12:30 – 3:30
*The Hyatt Lodge* at McDonald's Campus
2815 Jorie Blvd.
Oak Brook, IL 60523
(630) 990-5800
www.thelodge.hyatt.com

## Consumer Driven Healthcare Plan Results & Future Forecast
*Presented by: United Healthcare & Mid American Group, Inc.*
Health Reimbursement Arrangements (HRA's) - Solutions
> - What organizations are a good fit for an HRA?
> - HRA's have helped numerous employers lower PPO Premiums and achieve renewal increases well below the medical trend
> - Learn how to implement HRA's & Case Study Results!

High Deductible Health Plans (HDHP) with Health Savings Accounts (HSA's)
> - A 65-year-old couple retiring this year without employer-provided retiree health insurance will need about $215,000 to pay for future medical care-related expenses, according to an analysis by Fidelity Investments. An HSA can address this growing concern.
> - HSA Plans can be 30% lower in Premium than traditional PPO Plans
> - Tax Relief & Healthcare Act of 2006 – Improves upon HSA Plans
>   - *Increased HSA Contribution Limits, No Contribution Reduction for Persons Who Join the HDHP Mid-Year, Consolidation of Existing HRA and FSA Funds into HSA's, Rollovers of Existing IRA Funds into HSA's*
> - Learn about Employer HSA Funding Trends, and a Case Study Example

## The Latest Technology for Employee Benefits Portals & On-Line Enrollment
*Presented by: On-Line Benefits*
Learn all about the All-New Benergy Release B2G!
> - Easier site navigation, Special Alert for HR to push company information
> - B2G! provides a fluid combination of health, benefits and human resources in one personalized portal
> - The My Info Center will allow employees to self-register and keep a personal health record
> - The Health & Wellness Center is filled with research, illustrations, videos and interactive tools to educate people on medical and wellness topics

Are you looking for On-Line, Internet based Enrollment Solutions?
> - If your new employee and annual open enrollment process is becoming a "paper burden", Ready Enroll On-Line Enrollment Solutions are the answer
> - This optional feature from On-Line Benefits is inexpensive and easy to use
>   - Case Study   Employer Enrolls 600 employees all on-line

**Please RSVP** by calling Nicole Rodriguez at (630) 366-7438 or
email nicolerodriguez@midamgroup.com

# EXHIBIT H

# M MID AMERICAN GROUP

*"The Leading Edge"* ®

April, 2007

### Dear Clients and Friends,

The MetLife American Dream Study quantifies the growing financial concerns of Americans of all ages and income levels. There is a growing recognition that many of the programs and services that have been underpinning the finances of American families are changing.

But, the study also found that the American dream is still alive. Respondents believe that they can work hard and achieve their dreams.

Employers play an important - and growing - role in helping employees realize their dreams. Employers who are able to most effectively do so will be rewarded with loyal and productive employees.

*Sincerely yours,*
*Jim Lill, President*

# Americans' Financial Cares

A recent study by MetLife finds that Americans are growing increasingly concerned about their finances -- especially the ability of government to help them during retirement. The study of 1500 Americans of every age and income category reflected concerns that achieving the American dream may be more elusive than ever.

Almost two-thirds of those surveyed believe that nobody is looking out for their financial future. The Baby Boom generation was the most concerned with almost three-quarters sharing this view.

The Baby Boom generation may feel the most angst because it is during their working years that many changes have occurred. Job changes have become more frequent; pensions have been redefined from defined benefits to defined contributions and Medicare and Social Security programs are expected to be short of funds.

In fact, the survey found that almost three-quarters (73%) of those asked do not believe they can count on government-sponsored benefits such as Social Security and Medicare. Again, this concern was highest among Baby Boomers (79%). Seventy-four percent of Generation X members (those born between 1965 and 1976) also shared this view.

One of the responses to these financial concerns is increased worker mobility. More than one-half of all those surveyed believed that they need to change jobs to maintain an income to meet basic needs.

There are lessons for employers in these responses. Easing financial concerns can decrease employee turnover and increase productivity. Employers should trumpet the employee benefits that are geared to ease financial burdens. Employers may also wish to provide additional employee-paid benefits that will ease financial concerns.

## Ask us about free COBRA, FSA and FMLA administration!

**Mid American Group, Inc.** *The Leading Edge*© 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559 Phone: (630) 789-9508 Fax: (630) 789-9516 Email: JimLill@midamgroup.com  The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Milroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue the receipt of this monthly fax.)**

# EXHIBIT I

 **MID AMERICAN GROUP**

*"The Leading Edge"*

May, 2007

## Dear Clients and Friends,

We've all gone up to a door festooned with a beautiful wreath or other ornament. Usually there's a welcome mat at our feet, too.

But, we've all gone to a business door or just inside of one only to be greeted by a "no solicitors" or "no smoking" sign or other admonishments. When this greeting is coupled with old magazines or a harried receptionist – the impression is not an inviting one. And, this impression can color how a client or prospect views the firm's products and services.

Take the time to revisit your firm as if you're seeing it for the first time. A more welcoming impression will translate into more sales.

*Sincerely yours,*
*Jim Lill, President*

# Lasting First Impressions

Everyone knows the adage about getting only one chance to make a first impression. But, businesses get a number of chances to make a first impression – any one of which can impact the bottom line! After all, clients, salespeople, mail and package delivers, callers and emailers all come into contact with a business in one way or another. It's important to reflect on the welcome that is given in each case.

Most firms think about creating a good first impression when clients come to the office or store. Businesses should consider how welcome the client is before they even open the door. Is the entrance or doorway inviting?

Once inside, what does the person see and hear? People should be warmly greeted and assisted as soon as possible. Look around the waiting area. Are the magazines current or old and tattered? Is the greeter too busy to greet guests?

For many firms, the first impression is a voice over the phone or voice mail. If the first contact is with voice mail, what does this say about the importance of the call? Be sure that any menus are quick and easy or that callers can get to a live person, if desired.

What first impression is delivered when a package or letter is mailed and received?

Many firms have a web presence. When someone visits the website is it easy to navigate and inviting? How easy is it to find information that a client or customer may need?

Once each of these "impressions" has been considered separately they should then be considered together. Does the firm have a consistent image that is represented across the various media? If the message is inviting and the place – real or electronic – is inviting, then clients will feel at ease and welcome!

## *Ask us about free COBRA, FSA and FMLA administration!*

Mid American Group, Inc. *The Leading Edge* © 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559  Phone: **(630) 789-9508** Fax: (630) 789-9516  Email: JimLill@midamgroup.com   The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL

**(Please call us if you would like to discontinue the receipt of this monthly fax.)**

*The Advisor Advantage*

# EXHIBIT J

 **MID AMERICAN GROUP**
*"The Leading Edge"*®

June, 2007

**Dear Clients and Friends,**

The EEO-1 form has not been changed in more than 40 years. So, changes are probably warranted.

Employers need to review the revisions to the form and the definitions to ensure that the 2007 report is accurate. The employment figures for the report must be from any one pay period between July and September, 2007.

Employers are also being encouraged to resurvey current employees using the new race and ethnic categories. An easy way to update this information is to incorporate it into routine personal information updates.

*Sincerely yours,*
*Jim Lill, President*

# EEO-1 Form Changes

The EEO-1 form requires many employers to provide a count of their employees by job category and then by ethnicity, race and gender. This report is then submitted to both the EEOC (Equal Employment Opportunity Commission) and the Department of Labor, Office of Federal Contract Compliance Programs.

The EEO-1 must be filed by employers with federal government contracts of $50,000 or more and 50 or more employees as well as all employers with 100 or more employees. The form is filed annually and is due by September 30th. The new form must be used for this year's report due on September 30, 2007.

Employers completing this year's report will find several changes. The revised report adds a new category titled "two or more races." It also renames some race and ethnic categories.

Job categories are also reported on the form. The current category of "Officials and

Managers" will be divided into two levels based on the responsibility and influence within the firm. The two levels essentially separate senior level and executive officials from first line and mid-level officials and managers.

The revised form also moves business and financial occupations from the Officials and Managers category to the Professionals category. The goal of these moves is to improve data for analyzing trends in mobility of minorities and women within Officials and Managers.

The EEO-1 report is used to analyze employment patterns. Data analysis is also used to select facilities where the likelihood of systematic discrimination is the greatest. The form and information on completing it can be accessed on the Internet at www.eeoc.gov/eeo1/index.html.

## Ask us about free COBRA, FSA and FMLA administration!

Mid American Group, Inc. *The Leading Edge*© 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559 Phone: **(630) 789-9508** Fax: (630) 789-9516 Email: JimLill@midamgroup.com The information on this page is for general information only. It should not be construed as legal advice. All rights reserved. Pamela D. Mitroff Consulting, Inc. Wheaton, IL

# EXHIBIT K

 **MID AMERICAN GROUP**
*"The Leading Edge"*

**August, 2007**

*The Advisor Advantage*

**Dear Clients and Friends,**

Employers – large and small – run into difficulties applying the Fair Labor Standards Act. This Act determines when employees are subject to overtime, when and how they must be paid and the minimum wages that are paid. Employers should exercise caution and conduct periodic reviews of compliance with this important Federal law.

There are often State laws that add to the requirements regarding minimum wages, overtime and other employment laws. These must be considered, and where State laws are more generous, compliance becomes more complex.

*Sincerely yours,*
*Jim Lill, President*

# FLSA on Travel

With summertime and travel on the mind, this is a good opportunity to review the Fair Labor Standards Act's rules on when to pay for an employee's travel time. Employees who are non-exempt are generally paid on an hourly basis. As such, employers can become confused about how to pay an employee who has to travel on employer business.

One of the more common types of travel is to a lecture or meeting. Most employers consider such events as important and will reimburse them. However, such meetings need not be counted as "hours worked" only if four criteria are met:

1. It is outside normal hours

2. It is voluntary

3. It isn't job related

4. No other work is concurrently performed.

These four criteria are difficult to meet if a meeting or lecture is of value to a firm.

Travel away from home is another source of confusion. Travel that keeps an employee away from home overnight is travel away from home. This is considered work time if it occurs during what would be normal working hours for the employee. This includes corresponding hours on nonworking days such as weekends.

The federal Department of Labor provides guidance that it will not consider as work time that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus or automobile. However, if the employee conducts work while traveling – it can be considered work time.

If the travel is a one day assignment in another city and the employee returns home the same day different rules apply. The time spent traveling is work time. But, the employer may exclude the time that the employee would normally spend commuting to the regular work site.

## Ask us about free COBRA, FSA and FMLA administration!

**Mid American Group, Inc.** *The Leading Edge@* 760 Pasquinelli Drive, Suite 358, Westmont, IL 60559  Phone: **(630) 789-9508** Fax: (630) 789-9516  Email: JimLill@midamgroup.com   The information on this page is for general information only. It should not be construed as legal advice. All rights reserved.  Pamela D. Mitroff Consulting, Inc. Wheaton, IL

# EXHIBIT L



# MID AMERICAN GROUP INC.

## Complimentary Employee Benefits Luncheon & Seminar

### ■ Is Your Company Employee Benefit Compliant?

#### Presented by: Pedersen & Houpt, & Mid American Group, Inc.

Pedersen & Houpt provides a broad range of legal counsel focusing on employee benefits, executive compensation, employment law, start-up companies, entity formation, acquisitions and divestiture, financing, securities, taxation intellectual property and dispute resolution/litigation.

Join us as we discuss several areas of employer compliance. Presentations from experts in employment and ERISA law will discuss many topics of interest including:

❖ Guest Speakers: Paul Allman, Partner and Debra Chesnin, Associate

- ❖ Family & Medical Leave Act - Enacted in 1993. How to meet all requirements and avoid personal liability as managers. Be certain you are accurately granting and recording leave.
- ❖ Mental Health Parity - Enacted in 1996. Is your plan compliant?
- ❖ Women's Health Law - Enacted in 1998. Is your plan compliant?
- ❖ 5500 Filing Requirements
- ❖ ERISA Reporting Requirements
- ❖ HIPAA - Are you handling employee information confidentially? What are the requirements?
- ❖ Med care Part D - Learn about annual compliance requirements.
- ❖ COBRA - Penalties can be sizeable. Be sure you're taking all the necessary steps.